1
2
3
4
5

**UNITED STATES DISTRICT COURT**

6

**DISTRICT OF NEVADA**

7
8

WILLIAM E. AVELLO,                                     )
                                                       )
9                           Plaintiff,                 )   Case No. 2:13-cv-00504-JAD-GWF
                                                       )
10   vs.                                               )   **FINDINGS AND**
                                                       )   **RECOMMENDATION**
11   CAROYN W. COLVIN, Acting Commissioner,            )
     Social Security Administration,                   )
12                                                     )
                            Defendant.                 )
13   _____)

14          This matter is before the Court on Plaintiff William Avello's Complaint for Judicial Review

15   (#15), filed on March 22, 2013.[1]  The Acting Commissioner filed her Answer (#21) on August 7,

16   2013.  Plaintiff filed his Motion to Reverse or Remand the Commissioner's Decision Pursuant to

17   Sentence Four (#32) on December 16, 2013.  Plaintiff also filed a  Motion to Reverse or Remand the

18   Commissioner's Decision Pursuant to Sentence Six (#34) on December 16. 2013.  The Acting

19   Commissioner filed a Motion for Remand Pursuant to Sentence Four of 42 U.S.C. Section 405(g)

20   (#44) on May 9, 2014.  Plaintiff filed his Memorandum in Response to Defendant's Motion to

21   Remand the Commissioner's Decision (#48) on June 9, 2014.  Defendant filed her Reply to

22   Plaintiff's Opposition to Motion for Remand (#49 ) on July 21, 2014.

23                            **A.  PROCEDURAL HISTORY.**

24          Plaintiff filed applications for a period of disability, disability insurance benefits and

25   supplemental social security income on September 18, 2009, alleging that he became disabled

26   beginning June 22, 2009.  *See* Administrative Record ("AR") 224.  The Commissioner denied

27   Plaintiff's application initially on February 17, 2010, and upon reconsideration on April 15, 2010.

28
             _____
                   [1]This action was commenced on March 22, 2013.  The complaint was not actually entered in the docket
     until June 4, 2013.  *See Docket Entry #11.*

AR 224.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  *Id.*  The hearing was conducted on June 13, 2011 before ALJ Barry H. Jenkins.  AR 158-216.  On July 8, 2011, ALJ Jenkins issued his decision, finding that Plaintiff was not disabled at any time from June 22, 2009 until the date of the decision.  AR 224-236.  The Appeals Council granted Plaintiff's request for review on January 4, 2012 and remanded the claim to the ALJ for determination of certain issues.  AR 320-321.  A second hearing was conducted on March 5, 2012, and a third hearing was conducted on April 30, 2012.  AR 133-157, 91-132.  On May 17, 2012, ALJ Jenkins again found that Plaintiff was not disabled.  AR 32-49.  Plaintiff filed a request for review by the Appeals Council on June 21, 2012.  AR 26.  Plaintiff's  request for review was initially denied by the Appeals Council on January 25, 2013.  AR 11-14.  After Plaintiff objected, the Appeals Council set aside its denial.  After considering Plaintiff's objection in light of the entire record, however, the Appeals Council again denied Plaintiff's request for review on March 28, 2013.  AR 1-4.

Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g) on March 22, 2013.  Plaintiff also filed a concurrent claim for disability benefits with the Social Security Administration.  On August 20, 2013, the Commissioner awarded disability benefits to the Plaintiff with an effective onset date of disability of May 18, 2012, the day after ALJ Jenkins' second decision denying Plaintiff's claim.  *Plaintiff's Motion to Reverse or Remand Pursuant to Sentence Six (#34), Exhibit A.*

This matter has been referred to the undersigned magistrate judge for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

## B.  FACTUAL BACKGROUND.

### 1.   Medical Records Before the ALJ:

Plaintiff William Avello, then age 40, suffered a myocardial infarction in December 2008 which was diagnosed and treated at the University Medical Center in Las Vegas, Nevada and by doctors associated with Nevada Heart and Vascular.  AR 825-826.  At that time, stents were placed in the right coronary artery.  AR 704.  Mr. Avello apparently did relatively well until May 2009 when he began experiencing chest tightness and pain on minimal exertion.  He also complained about a cough which had started since he began taking medications following the December 2008 heart

attack. AR 704-705.

On June 22, 2009, Mr. Avello was admitted to Centennial Hills Hospital with complaints of nonexertional chest pain and pain going down the right arm. He also had dyspnea (shortness of breath) on exertion. AR 572-592. During this hospitalization, Plaintiff was evaluated by Dr. Tali Arik, a cardiologist. Mr. Avello underwent left heart catherization with selective coronary angiography, ventriculography, and conscious sedation. The conclusion of those procedures was that Plaintiff had 50% proximal anterior descending artery stenosis (narrowing); diffuse coronary artery disease involving the circumference, diagonal, and anterior descending arteries; total occlusion (blockage) of the mid right coronary artery within the previously placed stents; collateral filling of the distal right coronary artery; and normal left ventricular contractility and ejection fraction. AR 592. An angiogram was performed on June 25, 2009. An attempted revascularization of the right coronary artery was unsuccessful. AR 625.

Mr. Avello was thereafter seen by Dr. Tali Arik on January 6, 2010. AR 694. Dr. Arik stated that because of Mr. Avello's ongoing symptoms, "a surgical consultation was obtained and it was decided at the time of his hospitalization in June 2009 that he should not have bypass surgery for a chronically occluded right coronary artery given that he had some mild disease already of the circumflex and anterior descending arteries which might ultimately need revascularization too." Dr. Arik stated that over time he "has developed severe anginal symptoms considered functional class III with angina occurring walking only 30 feet at this time." Dr. Arik's "Impression was "1. Severe coronary symptoms functional class III with patient completely and totally disabled for same, not able to be revascularized either with percutaneous transluminal coronary angioplasty, tenting or surgery." AR 694.

On January 19, 2010, Mr. Avello was examined by Dr. Zev Lagstein, cardiologist, at the request of the Bureau of Disability. AR 627-631. Dr. Lagstein interviewed Mr. Avello and "reviewed incomplete past medical records." AR 627. Under "Symptoms/Complaints, Dr. Lagstein noted:

> Consists primarily of easy fatigability and chest pains with exertion. He found that brief period of rest will alleviate his chest pains. He has not used the sublingual nitroglycerin. There is no history of PND or

orthopnea [i.e., waking from sleep unable to breath or shortness of breath when lying flat]. The patient is also complaining of markedly diminished exercise tolerance. No history of sustained palpitations, near syncope, or syncope [fainting or passing out].

AR 628. (Bracketed information added by the Court).

Mr. Avello did not appear to be in acute distress and did not seem to be acutely or chronically ill. AR 628. The physical and neurological examination was generally within normal limits. Dr. Lagstein's "Impression" was as follows:

1.   Severe ischemic cardiomyopathy with total occlusion of the dominant right coronary artery following the deployment of several stents. Attempts to re-canalize the artery failed. However, this area supplied by collateral flow on the left side. The ejection fraction appeared to be normal. There is also a 50% lesion in the proximal LAD.

2.   Hypertension-suboptimally controlled at rest. no evidence of LVH or EKG.

3.   Dyslipidemia.

4.   Obesity.

Please note that the claimant is to undergo mycardial diffuse stress test next week. The results will be quite important as this may document the presence or absence of reversible myocardial perfusion defects.

AR 629.

Dr. Lagstein also completed a checklist form regarding Mr. Avello's residual functional capacity. He stated that Mr. Avello could occasionally lift less than 20 lbs and frequently lift 10 pounds; could stand and/or walk for at least 2 hours in an 8 hour work day; could sit for 6 or more hours in an 8 hour work day, and that standard breaks and lunch period would provide sufficient relief if he needed to alternate sitting and standing. He also stated that standard breaks and lunch would also provide sufficient relief to allow Plaintiff to work 8 hours. Dr. Lagstein indicated that Mr. Avello could occasionally climb ramps, stairs, ladders or scaffolds, stoop, bend, kneel, crouch, squat and crawl. He had no limitations for reaching, fingering, handling objects, hearing, seeing, speaking or traveling. He had no environmental restrictions for heights or moving machinery, but did need to avoid temperature extremes, chemicals, dust, noise, and vibration. AR 630-631.

Shortly after Dr. Lagstein's examination, Mr. Avello was seen at the University Medical Center (UMC) Emergency Room on January 24, 2010. He reported constant chest pain since early

1  that morning which felt similar to the pain he had during his previous heart attack episodes.  His pain

2  was 10/10 on a scale of 10.  Mr. Avello also reported some numbness in his left arm.  He was

3  discharged the following day when he was reportedly chest pain free.  AR 723-725.

4          A state agency single decisionmaker, Antoinette Rodie, prepared a Physical Residual

5  Functional Capacity Assessment on February 9, 2010.  AR 670-677.  Ms. Rodie found that Plaintiff

6  had a residual functional capacity consistent with the ability to perform light or sedentary work.  AR

7  676.

8          Mr. Avello was seen again at UMC on February 24, 2010 by Dr. Wesley.  AR 782.  He was

9  still complaining "of recurrent chest pain and shortness of breath with physical exertion with

10  minimal activity."  The doctor noted:

11              Mr. Avello's symptoms of chest pain are disproportionate to the
              noninvasive testing parameter that we are seeing.  He has only mild
12              disease in LAD, and his perfusion stress test is normal.  It is hard to
              believe that he is having significant organic pathology.  In any case, to
13              give him the benefit of the doubt, I have added amlodipine 5
              milligrams daily to his regimen of metoprolol, isosorbide, and Cozaar.
14              He will follow up in one months time to address this.

15          On April 7, 2010 Plaintiff reported to Dr. Wesley that he was feeling a little bit better.  He

16  stated that his chest pains had become better on amlodipine.  He had no shortness of breath,

17  orthopnea, or nocturnal dyspnea.  AR 698.  On June 2, 2010, Plaintiff reported to Dr. Wesley that he

18  had no chest pain, that he had shortness of breath in high altitudes, but had no orthopnea, nocturnal

19  dyspnea, ankle edema or claudication.  Dr. Wesley advised Plaintiff to lose weight, continue therapy

20  and follow-up periodically in three months.  AR 697.

21          On September 8, 2010, Plaintiff was seen at the UMC cardiology clinic for follow-up.  While

22  in the clinic, he had an episode of increased chest pain and was experiencing vomiting and nausea.

23  AR 696.  Plaintiff was seen by Dr. Sandra Thomasian who noted that Plaintiff also reported

24  shortness of breath and lightheadedness; he described his pain as 5/10, but stated that it was relieved

25  at the cardiologist's office by nitroglycerin.  AR 711.  Plaintiff was admitted for testing and was

26  apparently discharged the following day.

27          On January 25, 2011, Dr. Tali Arik wrote a brief letter addressed "To Whom it May

28  Concern," stating that Mr. Avello was totally disabled due to coronary artery disease.  Dr. Arik also

1   stated that "[h]is condition will never improve, it will only get worse."  AR 905.  On February 2,

2   2011, Mr. Avello's primary care physician, Dr. Richard Lieber, completed a functional capacity

3   checklist form in which he indicated that Mr. Avello could not work any hours during a work day,

4   could sit at one time for 2 hours, stand at one time for 15 minutes, occasionally lift 5 lbs and could

5   never bend.  AR 846.

6       On February 8, 2011, Plaintiff was seen at the Centennial Hills Hospital "complaining of

7   chest pain that has been going on for the last three days, progressively worse today, when he was

8   picking up his kids from school."  AR 917.  Plaintiff reported that his pain was about 8 out of 10 in

9   intensity with diaphoresis (sweating).  *Id.*  On February 10, 2011, Mr. Avello underwent cardiac

10  catherization. This procedure revealed LV ejection fraction to be 55% with mild inferior

11  hypokinesis.  The left descending artery had diffuse atherosclerosis throughout its course.  The mid

12  portion had 70% to 80% stenosis (narrowing).  The left circumflex artery had 65% to 70% stenosis.

13  AR 803-804.

14      On February 12, 2011, Mr. Avello was seen by Dr. Nancy Donahoe, M.D., a cardiovascular

15  surgeon, who noted Mr. Avello's history of coronary artery disease since December 2008.  She

16  stated: "The patient has had ongoing problems and presented to Centennial Hills Hospital on Sunday

17  with recurrent severe angina.  He underwent evaluation including catheter.  He was found to have

18  significant progression of his left-sided disease and is now in need of revascularization."  AR 736.

19  Dr. Donahoe performed triple coronary artery bypass grafting of the left arteries on February 15,

20  2011.  AR 771-773, 927.  Mr. Avello was discharged from the hospital on February 19, 2012.  AR

21  770.

22      Mr. Avello was referred for a second examination by Dr. Zev Lagstein on April 25, 2011.

23  AR 794-802.  Dr. Lagstein noted that the additional medical information was "remarkable only for

24  recurrent chest pains and triple coronary artery bypass surgery on 02/16/11 by Dr. Nancy Donahoe."

25  Dr. Lagstein stated that he had been provided with Dr. Arik's January 6, 2011 note regarding the

26  claimant's chest pains, but there was no note regarding Mr. Avello's cardiac status right before

27  surgery.  Mr. Avello told Dr. Lagstein that his right coronary artery could not be bypassed and that he

28  had three bypasses on the left side and most of the arteries were "in the 95% blocks."  Dr. Lagstein

noted that Mr. Avello was still complaining of chest wall pains, some chest tightness and swelling of both extremities.  Plaintiff also reported easy fatigability and stated that he could not walk or stay on his feet more than 20 minutes at a time.  Dr. Lagstein found no history to suggest PND, orthopnea, near syncope or syncope, palpitations or irregular heart beat.  On examination, Mr. Avello was in no acute distress, and did not appear to be acutely or chronically ill.  The remainder of the physical examination was normal.  AR 794-795.  An EKG was normal.  AR 796.

Dr. Lagstein stated that he would dictate an addendum to his report once he received the 02/16/11 operative report and angiographic reports and could review the extent of Plaintiff's preoperative coronary artery disease and the status of his left ventricular function.  He noted that Mr. Avello had "[g]eneralized and somatic symptoms such as easy fatigability, ankle edema, and chest tenderness all commonly seen following coronary artery bypass surgery."  AR 796.

Dr. Lagstein also completed another RFC checklist form.  He indicated that Mr. Avello could lift and carry up to 10 lbs frequently, occasionally lift and carry up to 20 lbs, and would be able to lift and carry up to 50 lbs six months after his recent surgery.  AR 797.  Mr. Avello could sit for a maximum of 6 hours without interruption, and could stand and walk for 1 hour without interruption. He could sit for a total of 8 hours in an 8 hour work day, could stand for a total of 3 hours, and could walk up to 4 hours in an 8 hour day once he was 6 months post surgery.  AR 798.  Dr. Lagstein's other findings were consistent with his previous RFC assessment.  AR 801.  Dr. Lagstein indicated that Mr. Avello could perform the following activities: shop; travel without a companion; ambulate without a cane, wheelchair or walker; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb steps using a hand rail at reasonable pace; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle and use paper/files.  AR 802.

On May 31, 2011, Mr. Avello was seen by Dr. William Resh for his first follow-up visit three months post bypass surgery.  AR 805-807.  Dr. Resh noted that Plaintiff had some marked dyspnea (shortness of breath) on exertion.  Mr. Avello reported that he got short of breath with the slightest amount of activity, but did not have shortness of breath at rest.  He had no PND (waking from sleep unable to breath), orthopnea (shortness of breath when lying flat), or peripheral edema.  AR 806. Under "Review of Symptoms," Dr. Resh noted that Mr. Avello had no chest pain, syncope, TIA or

stroke symptoms, or claudication.  Mr. Avello reported "[i]ntermittent infrequent palpitations occurring approximately once every couple of weeks."  AR 806.  Under pulmonary, Dr. Resh noted no cough, sputum, or hemoptysis.  Dr. Resh noted that Mr. Avello was allergic to Niaspan and Lisnoporil.  The physical examination was unremarkable.  AR 806.  Under "Discussion," Dr. Resh stated:

> 1.    Status post multivessel bypass surgery.  His right coronary artery could not be bypassed.  He had a LIMA to the LAD and vein graft to the diagonal and the circumflex system. Left ventricular function was normal at that time.  He has marked dyspnea on exertion, rule out LV dysfunction.   No obvious clinical congestive heart failure. . . . 3. Infrequent palpitations, rule out cardiac arrhythmia.

AR 807.

On August 4, 2011, Mr. Avello underwent an angiogram and stenting of the mid left anterior descending artery.[2]  AR 852.  He was seen in follow-up by Dr. Arik on August 9, 2011.  Dr. Arik stated that Plaintiff was "[p]ositive for chest pain occurring every day at rest and with no activity at all, and occurring with virtually all physical activity; positive for exertional dyspnea; negative for syncope or edema."  Plaintiff was negative for cough, sputum, wheezing or pleuritic chest pain.   Dr. Arik listed Plaintiff's diagnoses as angina, coronary bypass surgery, hyperlipidemia, hypertensive heart disease, and shortness of breath.  AR 857-858.  Dr. Arik further stated:

> Patient underwent a diagnostic catherization by Dr. Valencia.  Whatever could be revascularized was.  He has already been bypassed.  There is nothing to correct with further revascularization.  He still has functional class IV angina pectoris, angina at rest, and angina with minimal activity on maximal medication including carvedilol and Ranexa.  Blood pressure is now too low at 110/70 to allow further medication.  In my medical opinion the patient is totally and permanently disabled due to his severe heart disease.

AR 858.

Mr. Avello was seen in the Summerlin Hospital Emergency Room on September 16, 2011, apparently after feeling a "pop" in the right chest the previous day.  AR 861.

Dr. Arik saw Plaintiff in follow-up on November 1, 2011.  He noted that since the last visit,

---

[2]This appointment occurred after the ALJ issued his first decision denying Plaintiff's claim on July 8, 2011.

Mr. Avello had an episode of severe wheezing and tightness and was going to go to the ER, but the symptoms resolved.  Dr. Arik stated that "despite having completed EECP therapy with excellent relief of angina, now symptoms are coming back with exertion, above average levels of it.  Whether this represents coronary artery disease or not is unclear and will be difficult to sort out, but it remains a fact that he has severe coronary artery disease, which is progressively worsening."  AR 871.

On November 29, 2011, Dr. Arik wrote a letter which stated that Mr. Avello had "decompensated from a cardiac standpoint developing recurrent chest pain, having chest pain so severe he considered going to the emergency room, and now having exertional wheezing with chest tightness and pressure with above average levels of exertion, which was initially not present after he completed his EECP therapy."  Dr. Arik reiterated that Mr. Avello's "condition has clearly decompensated.  He has already undergone coronary intervention with angioplasty and stenting, has undergone coronary bypass surgery already, February 15, 2011, and has documentation at subsequent catherizations of occlusion of bypass grafts and progression of his coronary artery disease (catherization from August 4, 2011).  The patient has been on multiple antianginal therapies, has controlled his risk factors including his lipids and has done a course of EECP therapy completed on October 28, 2011."  AR 869.  Dr. Arik stated:

> In short, this patient has done everything possible to alleviate symptoms and restore full functionality, but clearly is completely disabled and cannot work given the unpredictable nature and progressive nature of his heart disease with recurrent symptoms occurring within one month of successfully completing a course of EECP therapy, which initially appeared to have been successful.

AR 869.

On January 8, 2012, Plaintiff was seen at the Centennial Hills Hospital Emergency Room for chest pain and was admitted for overnight observation. He was discharged on January 9, 2012.  AR 947-949.  The next day, January 10, 2012, Plaintiff went to Summerlin Hospital, again complaining of chest pain.  He underwent cardiac catherization, with a finding that no further intervention was needed, and was discharged on January 12, 2012.  AR 891-894.

Dr. Arik saw Plaintiff in follow-up on January 24, 2012.  AR 979-980.  Plaintiff reported that he was now having daily chest pain.  Dr. Arik noted that he was positive for chest pain at rest, positive for chest pain with any activity, such as showering, and positive for dyspnea.  AR 980.

On January 24, 2012, Dr. Arik completed a Cardiac Residual Functional Capacity Questionnaire form.  AR 898-902.  He stated that Mr. Avello's diagnosis was "IV," and that his prognosis was "poor, no improvement."  AR 898.  His symptoms included chest pain, anginal equivalent pain, shortness of breath, fatigue, weakness, palpitations and dizziness.  Plaintiff was experiencing anginal pain daily, sometimes enough to require hospital admission.  Dr. Arik stated that Plaintiff was not a malingerer.  AR 898.  Dr. Arik also stated that stress plays a significant role in bringing on Mr. Avello symptoms and that he was incapable of even "low stress" jobs.  He noted that Mr. Avello's chest pains occur daily, randomly, and were severe enough to warrant hospital stay. AR 899.  The symptoms and limitations caused Plaintiff to experience emotional difficulties such as depression and anxiety.  Dr. Arik stated that Plaintiff's symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks.  He stated that Plaintiff could not walk a block without rest or severe pain.  AR 900.  Plaintiff's ability to sit or stand/walk in an 8 hour day was less than 2 hours.

Dr. Arik responded "yes" to the question whether Plaintiff would need a job that permits him to shift positions at will from sitting, standing or walking, and that he would need to take at least one unscheduled break per 8 hours to lie down.  He also indicated that with prolonged sitting, Mr. Avello's legs should be elevated 30 degrees for 30 minutes.  AR 900.  Dr. Arik stated that Plaintiff could not lift even less than 10 lbs and could never crouch, squat or climb ladders, could rarely twist or stoop, and could occasionally climb stairs.  He stated that Plaintiff should avoid even moderate exposure to extreme cold, high humidity, wetness and dust, and should avoid all exposure to extreme heat, cigarette smoke, perfumes, soldering fluxes, solvents and cleaners, fumes, odors, gasses, and chemicals.

The last page of the questionnaire asked whether the patient's impairments were likely to produce "good days" and "bad days."  Dr. Arik answered yes.  The follow-up question asked, on average, how many days per month the patient "is likely to be absent from work as a result of the impairments or treatment."  Dr. Arik checked "More than four days per month."  AR 902.  Question 17 asked "What is the earliest date that the description of symptoms and limitations described in this questionnaire applies?"  Dr. Arik answered by stating "see 11/29/11 documentation."  AR 902.   Dr.

10

1   Arik wrote a follow-up letter on February 21, 2012 reiterating his opinion that Mr. Avello is totally

2   disabled and that no further treatment could improve his medical condition.  AR 903.

3        On March 12, 2012, Mr. Avello's primary care physician Dr. Richard Lieber answered a

4   "Provider Interrogatory" sent to him by ALJ Jenkins.  Dr. Lieber stated under penalty of perjury and

5   to a reasonable degree of medical certainty that Mr. Avello was unable to perform any form of

6   sedentary work due to severe heart disease causing chest pain at rest.  AR 907-908.  ALJ Jenkins sent

7   the same interrogatory to Dr. Arik who answered it on March 13, 2012, also  stating that Plaintiff

8   could not perform any form of sedentary work because "[h]e has recurrent severe chest pains that

9   occur randomly at rest, at times necessitating emergency transport to an Emergency Room."  ARE

10  909.

11       Dr. Arik completed a second Cardiac Residual Functional Capacity Questionnaire on April

12  26, 2012.  AR 911-916.  He stated that he had seen Mr. Avello approximately monthly, or every

13  other month, since June 2011.  His diagnosis of Plaintiff's condition was angina pectoris, class IV,

14  with symptoms at rest.  Plaintiff's symptoms included chest pain, shortness of breath, fatigue,

15  weakness, palpitations, dizziness and sweatiness.  AR 911.  The angina pain varied from pain several

16  days in a row to Plaintiff going one or two weeks without pain.  Dr. Arik stated that the pain can

17  occur randomly, even at rest, and can reach a level of 10 out of 10 in severity causing the Plaintiff to

18  go to the emergency room.  Dr. Arik answered "yes" to the question whether the patient has "*marked

19  limitation of physical activity* as demonstrated by fatigue, palpitation, dyspnea or anginal discomfort

20  on ordinary physical activity, even though your patient is completely at rest."  AR 912.  Dr. Arik

21  again stated that stress plays an important, significant role in bringing on the symptoms.  He stated

22  that Plaintiff was incapable of even "low stress" jobs, as explained by his hospital admissions and

23  clinic visits for chest pain at rest.  AR 913.  Dr. Arik again answered "yes" to the question whether

24  the patient's physical symptoms and limitations cause emotional difficulties such as depression or

25  chronic anxiety. He also answered "yes" to the question whether emotional factors contribute to the

26  severity of the patient's subjective symptoms and functional limitations.  AR 912.  He reported that

27  Mr. Avello frequently experiences cardiac symptoms (including preoccupation with his cardiac

28  condition) that interferes with attention and concentration.  He stated that the patient's physical plus

11

emotional impairments are reasonably consistent with the symptoms and functional limitations described in his evaluation.  AR 913.

Dr. Arik stated that Mr. Avello could walk less than one block without rest; could sit 15 minutes before needing to get up; and could stand 15 minutes before needing to sit down, walk around etc.  AR 913.  In contrast to his affirmative answer in the January 24, 2012 questionnaire, Dr. Arik stated that the question whether the patient needs a job which permits shifting positions at will from sitting, standing or walking, was "not relevant."  Dr. Arik stated that Mr. Avello could rarely lift less than 10 pounds, and never lift 10 or more pounds.  He stated that Plaintiff should avoid all exposure to extreme cold or heat; avoid concentrated exposure to wetness and humidity; and avoid even moderate exposure to noise, fumes odors, dust, gasses, and poor ventilation.  He should avoid all exposure to hazards such as machinery or heights.  AR 915.  Dr. Arik again stated that Plaintiff was likely to be absent from work four days a month as a result of his impairments or treatment.  AR 104, 916.

## 2. <u>Medical Records Before the Appeals Counsel:</u>

Plaintiff submitted additional medical evidence in support of his request for review of ALJ Jenkins' May 17, 2012 decision by the Appeals Counsel.  AR 1-6.  The additional records include a June 22, 2012 report by Dr. Julian Freeman who reviewed and summarized the medical evidence regarding Mr. Avello's coronary artery disease.  Dr. Freeman concluded that Plaintiff's condition satisfied a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix I, Sections 404.A.1 and 404.B even before the alleged onset date, June 22, 2009.  Dr. Freeman stated that Plaintiff's treadmill tests were misread, and if read properly would meet listing 404.A.1.  He stated, however, that even without the treadmill test results, as properly re-read or re-interpreted, Plaintiff's condition met the listing criteria under section 404.B.  AR 531-533.

Plaintiff also submitted a July 18, 2012 letter from Dr. Nancy Donahoe who stated that Mr. Avello "has very severe, diffuse disease and has rather rapid progression of his disease after both his angioplasty and stent as well as after his bypass surgery.  There is nothing further that can be done surgically in my opinion.  Unfortunately, this gentleman continues to have daily angina which significantly interferes with his life."  AR 535.  Plaintiff also submitted records for a hospitalization

1    at Centennial Hills Hospital on August 8-9, 2012 during which he complained of sharp chest pains,

2    lightheadedness and dizziness.  AR 537-559.

3    **3.      Plaintiff's SSA Disability Reports and June 13, 2011 Hearing Testimony:**

4    Plaintiff William Avello was 43 years old at the time of the first hearing on June 13, 2011.

5    AR 455, 162.  He had recently remarried.  He had two children from a previous marriage, then ages

6    12 and 13, who also resided with him and his wife.  AR 162-163. According to a November 10, 2009

7    SSA work history report, Mr. Avello previously worked as a security officer, telephone customer

8    service employee; and as an armored car driver/security officer for Garda Company from October

9    2007 to June 2009.  AR 447-451.  In an April 8, 2010 work history report, Mr. Avello stated that he

10   worked for Garda from November 2007 until September 2009.  AR 467.  Mr. Avello testified at the

11   hearing that he had also performed construction work, and worked for a pest control company and

12   for a health club.  AR 168-169.

13   Mr. Avello testified that his first heart attack occurred in December 2008, at which time

14   stents were placed in his coronary artery.  AR 169-170.  He suffered a torn ligament injury at work

15   on April 14, 2009 and was off work recuperating from that injury when he suffered his second heart

16   attack on June 22, 2009.  Garda terminated his employment after the second heart attack because he

17   could not longer perform the job.  AR 169-171, 187-188.

18   The ALJ asked Plaintiff about the side effects of his medications.  Mr. Avello testified that he

19   took Niaspan which caused his body to turn red or flush and he experienced a fever that could last

20   from two to six hours.  AR 172.  The Niaspan also caused him to stay awake for two to six hours at

21   night.  AR 173.  Mr. Avello stated that his blood pressure medications caused his mouth to become

22   dry, clogged his breathing and made him gag.  AR 172-173.  He also stated that he experienced

23   episodes of vomiting and diarrhea three days a week.  These episodes could last for hours and caused

24   him difficulty sleeping.  When he was experiencing vomiting or diarrhea, he used the bathroom

25   every hour or hour and a half.  AR 193.  He also attributed these symptoms to the Niaspan.  AR 173-

26   174.  He indicated that he experienced a sleepless night about three times a week.  AR 178.

27   The ALJ asked Mr. Avello what prevented him from working a job that does not require

28   physical exertion.  He responded that his right coronary artery was completely collapsed after his

13

1    second heart attack in June 2009.  As a result, he suffers from angina--chest pain caused by a lack of

2    sufficient blood flow and oxygen to the heart.  AR 175.  He testified that stress or exertion will cause

3    him to experience chest pains and dizziness.  He experiences these symptoms two to five times a day

4    depending on what he is doing.  When he experiences chest pains, he has to lay down and relax until

5    it goes away.  AR 176.

6         Mr. Avello testified that he does not smoke, drink alcohol or use illegal drugs.  He still drives

7    an automobile.  AR 177.  He stated that he drives his children to school and back, three miles each

8    way, one to three times a week, depending on how he is feeling.  If he was not feeling well, his wife

9    or one of his daughter's friends (i.e parents) would take his children to and from school.  AR 178.

10   He also stated that he goes to his wife's place of employment, which is "down the street."  His wife

11   is a hairdresser and he goes to her salon to get his haircut "or bring the kids there or something."  AR

12   180.  Otherwise, he avoids driving because it causes him stress.  AR 179.  He testified that he does

13   not go to the supermarket.  Mr. Avello stated that he has no social life at all.  He is in the house

14   "[m]ostly all the time."  AR 180.

15        Mr. Avello testified that on a typical day he drives his children to school and comes back

16   home.  He eats something around 10 or 11 a.m. and watches TV.  Around 12:30 or 1:00 p.m. he

17   takes a nap for an hour to an hour and a half.  He picks his children up from school at around 2:00

18   p.m.  He comes back home, helps his children with their homework if they need it.  "Most of the

19   time they don't."  He stated that he is in bed by 7:30 or 8:00 p.m.  AR 181-182.  Mr. Avello testified

20   that his house is two stories and his bedroom is on the second floor.  When he goes upstairs at the

21   end of the day, he stays there.  If he needs anything from upstairs prior to that, he has his children get

22   it for him.  AR 182-183.  Mr. Avello indicated that he is able to take care of his personal hygiene

23   and dress himself.  He uses a safety pole in the shower.  AR 194

24        Mr. Avello testified that he does not lift anything over five pounds because he has an

25   "umbilical hernia" that cannot be operated on because of his heart condition.  He indicated that the

26   five pound limit is a doctor's restriction.  AR 180-181.  He stated that he can stand in one place,

27   shifting his feet for 15-20 minutes, after which his feet start to throb.  He has a hard time going

28   upstairs.  He estimated that he can walk on a level surface approximately the distance of three

houses, or thirty to forty feet, before his heart rate starts to get up and he has to slow down, stop or go back and get off his feet.  He indicated that after sitting for fifteen minutes, he gets stiff.  Mr. Avello had difficulty estimating the time he could sit in one place before getting up or moving about.  He stated that he has to frequently get up or move about because of his angina.  He also experiences jaw pain, neck pain and back pain which is associated with his angina.  AR 184-186.  Hot weather exacerbates his angina.  AR 187.   He cannot stoop down because it is painful and he cannot crawl, kneel or climb.  He testified that he can bend slightly, but cannot reach above his head.  AR 189. Mr. Avello testified that he felt depressed because of his physical condition, his financial condition and inability to support his family, and because of his lack of a social life.  AR 196.

Vocational expert Bernard Preston testified that Plaintiff's previous jobs were light, medium or heavy duty jobs.  AR 203-204.  The ALJ asked Mr. Preston whether a hypothetical person of Mr. Avello's age, education and experience who was capable of performing work at the light exertional level, could perform any of his past work subject to additional restrictions relating to climbing, balancing, stooping, kneeling, crouching, crawling, reaching overhead, exposure to extreme heat, cold, vibrations, hazardous machinery, or unprotected heights.  AR 204.  Mr. Preston responded that such a person could perform Plaintiff's past work as a security officer, armed guard, and customer service representative.  AR 205.  He stated that the person could also perform other light duty work such as a garment sorter, ticket taker, or gate guard.  AR 206-207.  The person could also perform sedentary jobs such a system surveillance monitor, call-out operator, and information clerk.  AR 208.

Plaintiff's attorney and the ALJ questioned Mr. Avello further about his vomiting and diarrhea episodes--how frequently they occur on a daily or weekly basis, and how often he uses the bathroom during these episodes.  AR 209-213.  Mr. Preston interpreted Mr. Avello's responses as indicating that he would have to use the restroom four to six times for 15 to 20 minutes during a workday.  Based on that level of required breaks, Mr. Preston testified that Plaintiff would not be able to perform his past work or other light or sedentary work available in the national economy.  AR 214.

**2.  March 5, 2012 Hearing:**

Mr. Avello appeared for a second hearing on March 5, 2012.  AR 133-157.  At the outset of

15

1  this hearing, ALJ Jenkins noted that he had previously determined that Mr. Avello was capable of

2  working at a sedentary level with certain limitations. AR 136. Mr. Avello's counsel questioned him

3  about the medical examinations performed by Dr. Zev Lagstein. Mr. Avello testified that Dr.

4  Lagstein saw him for approximately seven to eight minutes during each examination. AR 138. He

5  also testified that during the second examination, Dr. Lagstein "reviewed my file from the first time

6  and said oh I remember you. And then said to me I wonder why you're back here. He said, I would

7  have thought you would have got your disability because of the comments I made the first time."

8  AR 139.

9      The ALJ asked Plaintiff if he was on a list for a heart transplant. Mr. Avello testified that the

10  problem was not with his heart, but with his coronary arteries. AR 144-146. The ALJ then asked

11  Plaintiff how many times he had been in the hospital since January 2011. Mr. Avello testified that

12  he had been in the hospital approximately four times, with each stay lasting two to three days. AR

13  148. The ALJ noted that Mr. Avello was coughing a lot and asked him if there was a reason for that.

14  Mr. Avello stated that it was a side effect of his blood pressure medicine. AR 152-153.

15     The ALJ asked Vocational expert Jack Dymond whether a hypothetical person of Plaintiff's

16  age, education and experience, with limitations requiring him to elevate his legs during the work day,

17  and restrictions or limitations on lifting more than 10 pounds, crouching, climbing stairs, avoiding

18  exposure to extreme cold, heat, humidity, wetness, fumes, gasses, chemicals, etc. could perform any

19  work. Mr. Dymond identified surveillance systems monitor as the only work that Plaintiff could

20  perform. In response to Plaintiff's counsel's questioning, Mr. Dymond testified that Mr. Avello

21  would not be able to perform that job if he could not sit for two hours in an eight hour work day. AR

22  153-156.

23     **3. April 30, 2012 Hearing:**

24     Dr. Tali Arik testified at the third hearing on April 30, 2012. The ALJ reviewed with Dr.

25  Arik his responses to the Cardiac Residual Functional Capacity Questionnaire that he completed on

26  April 26, 2012. AR 95-104. The ALJ also reviewed the patient's listed medications with Dr. Arik.

27  Dr. Arik noted that Mr. Avello is prone to bruising and bleeding because of the Aspirin/Effient. He

28  testified that the bleeding risk might have an occupational implication. AR 101-102. The ALJ asked

Dr. Arik why Plaintiff should avoid excessive noise.  The doctor answered because of stress.  AR 103.  Dr. Arik testified that Mr. Avello had not been instructed to stop driving an automobile, but noted a level of "unpredictability" with this activity.  AR 104.

Dr. Arik testified that Mr. Avello has coronary artery disease, which can also be characterized as artery blockage disease, and ischemic heart disease.  AR 105-106.  He stated that Mr. Avello is not a candidate for heart transplant because "his heart actually pumps well, it's just that the flow of blood to it is impaired so he gets chest pain.  And transplants aren't done for chest pain patients, only for impaired pumping capacity patients."  AR 107.  Dr. Arik testified that Plaintiff's coronary artery disease is very advanced for someone his age.  He stated that it is very unusual to see "this much disease in a person his age, . . . and at the same time, when young people have this much disease it tends to be more advanced."  AR 107.  Dr. Arik also testified that there was nothing that could be done to improve Plaintiff's disease and that it is progressively getting worse.  AR 108-110.

Dr. Arik testified that in his opinion patients with coronary artery disease such as Mr. Avello have difficulty maintaining employment because of the need to take time off from work when they are having episodes, or because of the employer's concern that the employee will suffer a heart attack. AR 110-111.   The ALJ asked Dr. Arik about the use of nitroglycerin to control or relieve chest pain:

> Q.     Okay.  In that typical patient, and hopefully that this also applies to the Claimant, does the -- apart from the employer's concern, does the nitro control the chest pain or relieve the chest pain?
>
> A.      It's -- nitro is an interesting product.  I mean, it's been around for a long time to treat angina.  It does provide symptom relief by relaxing or dilating arteries, improving flow temporarily, and yes, it's a valuable way of aborting an episode.

AR 111.

The ALJ asked Dr. Arik why an employer would send an employee home if his symptoms are relieved by nitroglycerin.  Dr. Arik responded that it was puzzling to him, but that employers seem to be very uncomfortable because they may think the person is progressing to a heart attack.  AR 111.  Under questioning by Mr. Avello's attorney Dr. Arik reiterated his opinion that Plaintiff would likely

17

to be absent from work four days a month because of his impairments or treatment.

The ALJ briefly questioned Mr. Avello about his daily activities.  Mr. Avello testified consistent with his testimony at the June 13, 2011 hearing.  AR 115-116.  Near the end of the hearing, Mr. Avello also testified that he uses an inhaler because of his breathing difficulties.  He also testified that he has coughing and breathing difficulties when exposed to perfumes or similar odors.  AR 127-128.

The ALJ asked the vocation expert, Bernard Preston, the following hypothetical:

> If we had a person of the Claimant's age, education and experience who was deemed capable of performing sedentary work, except that he may only occasionally twist, climb ramps or stairs, balance, stoop, kneel and crawl.  He may never climb ropes, ladders or scaffolds.  He must avoid all exposure to hazardous machinery, extreme temperatures, hot or cold, avoid even moderate exposure to excessive vibration, avoid concentrated exposure to unprotected heights and operational control of moving machinery.  He may occasionally operate a motor vehicle.  He must avoid concentrated exposure to excessive wetness and humidity, as well as concentrated exposure to excessive noise.  With those limitations in mind, would such a person be able to perform the work of surveillance system monitor, call out operator, or information clerk?

AR 118.

After clarifying that the person could be exposed to moderate noise, such as that encountered in a business office where typewriters are used, or in a department store, Mr. Preston testified that the person could work as a surveillance system monitor and an information clerk, but not as a call-out operator because of the twisting limitation.  AR 118-119.  Mr. Preston also testified that the person could perform work as a tube operator and a document preparer.  AR 120-121.  Under questioning by Plaintiff's counsel, Mr. Preston testified that the person would not be able to do any of the foregoing jobs if he was limited to standing or sitting for 15 minutes because that limitation would place him below the functional level required for sedentary work.  AR 121.  He indicated a person with a sit/stand option could perform the referenced jobs.  AR 124-125.  Mr. Preston also testified that Mr. Avello's sensitivity to perfumes and similar odors would not eliminate his ability to work as a surveillance system monitor, but would erode his ability to work in other jobs.  AR 130.

. . .

. . .

18

## C. **ADMINISTRATIVE DECISIONS.**

### 1. **ALJ's July 8, 2011 Decision:**

In his July 8, 2011 decision, ALJ Jenkins applied the five-step sequential evaluation process established by the Social Security Administration.  *See* 20 C.F.R. 404.1520 and 416.920.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since June 22, 2009.  At step two, he found that Plaintiff had a severe impairment of coronary artery disease.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, (20 CFR 404.1520(d) 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.  The ALJ stated in this regard, "[t]he claimant's impairment does not meet or medically equal the criteria of listing 4.02 (chronic heart failure), listing 4.04 (ischemic heart disease), or any other listing."  AR 226.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) "except that he may only occasionally climb ramps or stairs, balance, stoop, crouch kneel and crawl; he may never climb ropes, ladders or scaffolds; he must avoid all temperature extremes, moderate vibration, and concentrated exposure to unprotected heights, hazardous machinery, and operational control of moving machinery."  AR 227.  After summarizing the medical evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but rejected Plaintiff's statements and testimony regarding the intensity and severity of his symptoms to the extent they were inconsistent with ALJ's determination of his residual functional capacity.  AR 230.

In discounting the credibility of Plaintiff's statements and testimony, the ALJ stated that he had not generally received the type of medical treatment one would expect for a totally disabled person.  He noted that while Plaintiff underwent surgery in February 2011, the record reflected that the surgery was generally successful in relieving his symptoms.  The ALJ noted Dr. Lagstein's opinion that claimant's symptoms would only last six months post-op.  He further noted Dr. Thomasian's report in September 2010 that Plaintiff's chest pain became stable after he was given

19

nitroglycerin and other medication.  The ALJ stated that the medical records did not support Plaintiff's testimony that his medications cause side effects, including sleeplessness, dry mouth, gagging, occasional vomiting or diarrhea.  AR 231.  The ALJ also discounted Plaintiff's credibility based on his allegedly sporadic work history which raised a question whether his continuing unemployment was actually due to medical impairments.  The ALJ stated that Plaintiff gave inconsistent information regarding his past work, specifically the dates he started and/or ceased working as an armored truck driver.  AR 231.

The ALJ rejected Dr. Arik's opinions that Plaintiff was totally disabled on the grounds that he "seemed to uncritically accept as true most, if not all, of what the claimant reported."  AR 232.  The ALJ also noted that the course of treatment pursued by the doctor had not been consistent with what one would expect if the claimant were truly disabled.  *Id.*  The ALJ questioned whether Dr. Arik was familiar with the definition of disability as used in the Social Security Act and regulations and therefore afforded "diminished weight to his January 6, 2010 opinion that Plaintiff was disabled.  AR 232.  The ALJ noted that the claimant's representative indicated that there was a February 2, 2011 opinion from Dr. Richard Lieber "that provides the claimant is unable to work and cannot stand or sit."  The ALJ stated that no such medical document existed in the record, but that "[e]ven if it were found in the record, such an opinion would be inconsistent with other medical evidence in the record."  AR 233.  By contrast, the ALJ found that "Dr. Lagstein's opinion is consistent with the objective medical evidence and is the opinion of an examining doctor in a physical examination and, therefore, I afford Dr. Lagstein's opinion great weight."  AR 234.

The ALJ concluded at step four that Plaintiff was unable to perform his past relevant work which was light duty or greater.  AR 234.  He concluded at step five, however, that Plaintiff had the ability to perform sedentary jobs such as surveillance systems monitor, call out operator, and information clerk.  The ALJ rejected Plaintiff's testimony regarding the extent of his vomiting and diarrhea symptoms, and therefore rejected the claimant's testimony that he would be required to take numerous restroom breaks during the work day.  AR 235.

**2.  Appeals Council's January 4, 2012 Order:**

The Appeals Council vacated ALJ Jenkins' July 8, 2011 decision and remanded the claim for

1  resolution of the following issues: First, the Appeals Council noted that Dr. Richard Lieber's

2  February 9, 2011 statement regarding Plaintiff's physical limitations and restrictions had been

3  submitted with the request for review.  Plaintiff also submitted Dr. Arik's November 29, 2011

4  statement in support of his request for review.  The Appeals Council stated that this additional

5  evidence should be evaluated.  Second, the Appeals Council noted that the ALJ's statement that

6  Plaintiff's work history was sporadic and a reason for discounting his credibility was contrary to his

7  earnings record which reflected consistent work activity through 2009.  The Appeals Council

8  therefore stated that further assessment of the claimant's credibility was needed.  AR 320.

9       The Appeals Council directed the ALJ to further evaluate the claimant's subjective

10  complaints and provide rationale in accordance with the disability regulations pertaining to the

11  evaluation of symptoms.  The Appeals Counsel also directed the ALJ to give further consideration to

12  the claimant's maximum residual functional capacity during the entire period at issue and provide

13  rationale with specific references to the evidence of record in support of assessed limitations.  In this

14  regard, the ALJ was directed to consider the additional reports/opinions of Dr. Lieber and Dr. Arik.

15  The Appeals Counsel stated that the ALJ may request the treating source to provide additional

16  evidence and/or further clarification of his opinion.  It also stated that the ALJ may obtain

17  supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the

18  claimant's occupational bases.  AR 321.

19       **3.**    **ALJ's May 17, 2012 Decision:**

20       In his May 17, 2012 decision, the ALJ again found that Plaintiff had not engaged in

21  substantial gainful activity since June 22, 2009, that he had the severe impairment of coronary artery

22  disease, and that he did not have an impairment or combination of impairments that meets or

23  medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  AR 34-

24  35.  The ALJ again found that Plaintiff had the residual functional capacity to perform sedentary

25  work, with the following limitations: Plaintiff may occasionally twist and climb ramps or stairs, but

26  may not crouch or climb ropes, ladders or scaffolds.  He may occasionally balance, stoop, kneel, and

27  crawl.  He must avoid all exposure to hazardous machinery and operational control of moving

28  machinery.  He may occasionally operate a motor vehicle.  He must avoid concentrated exposure to

pulmonary irritants including smoke, fumes, odors, perfumes, and dust.  He was also limited to unskilled work.  AR 35.

The ALJ stated that for "clear and convincing reasons," he found that the claimant's allegations of disabling limitations were not credible to the extent alleged.   The ALJ stated that "[i]nconsistencies in the claimant's testimony and statements render his allegations not credible.  The ALJ then stated: "Dr. Arik has indicated that the claimant's pain varies from several days in a row to a week or two without pain.  Dr. Arik testified that the claimant's pain is random in frequency and intensity.  This contradicts the claimant's allegation that he suffers from constant pain."  The ALJ referenced Plaintiff's October 2009 Disability Report in which he reportedly stated: "I am unable to lift anything over 5 lbs.  I am in constant pain.  I have shortness of breathe and dizzy spells."  AR, 40, 349.

The ALJ also stated that the claimant's medical records did not support a claim that he would miss work four or more days per month as opined by Dr. Arik. AR 40.  The ALJ prepared a table of Plaintiff's medical appointments or hospitalizations.  AR 40-42.  Based on this table, the ALJ stated that "not only does the claimant not see Dr. Arik once a month, but also his medical records show that he does not receive treatment for his symptoms as frequently as four times or more per month."  AR 40-42.  The ALJ stated that "this table may not reflect those days in which the claimant suffered from angina, but did not seek treatment.  However, as indicated by his cardiologist, Dr. Arik, nitroglycerin is very effective in treating the claimant's angina virtually instantly, hence those episodes should not prevent the claimant from going to or staying at work, particularly at a sedentary level."  AR 42.

The ALJ also found that Plaintiff gave inconsistent testimony as to how much weight he could lift.  At one time saying only 5 pounds, but later stating that he could lift 10 pounds.  AR 42.  The ALJ noted that Plaintiff stated that he had a hernia, which was inoperable because of his heart condition.  The ALJ, however, found no reference to a hernia in the records.  AR 43.  The ALJ also stated that Plaintiff's description of his daily activities were consistent with the residual functional capacity to perform sedentary work.  AR 43.

The ALJ declined to afford "much weight" to the opinions of Plaintiff's treating physicians.

22

1  The ALJ again cited Dr. Arik's hearing testimony regarding the effectiveness of nitroglycerin in

2  "immediately" aborting or alleviating an angina episode.  AR 43.  The ALJ noted that Dr. Arik

3  testified that the problem was not that nitroglycerin did not relieve the patient's angina symptoms,

4  but that employers were reluctant to retain an employee who was taking nitroglycerin at work for

5  angina episodes.  AR 43.  The ALJ stated: "In as much as the claimant's angina can be treated with

6  nitroglycerin, I find that the claimant has the functional capacity to work, notwithstanding the

7  possibility that employers might conceivably be concerned regarding his condition and treatment."

8  AR 43.  The ALJ also found Dr. Arik's repeated statements that Plaintiff is totally and permanently

9  disabled to be unduly extreme, particularly in light of the effectiveness of nitroglycerin and without

10 reference to any particular job description.  The ALJ stated that it was extreme for Dr. Arik to state

11 that Plaintiff would never return to work "without knowing what medical advances may occur in the

12 future."  AR 43.  The ALJ again doubted whether Dr. Arik was familiar with the definition of

13 "disability" as used in the Social Security Act and regulations.  AR 44.

14        The ALJ also noted inconsistencies in Dr. Arik's report and opinion.  The ALJ stated, "[f]or

15 example, while he states that the claimant is totally and permanently disabled, he also states that he

16 intends to repeat Echo and stress testing to see if there is anything that should or could be

17 revascularized."  The ALJ referred to Dr. Arik's January 6, 2010 report.  (Exhibits 12F and 20F/20).

18 AR 694, 806.  The ALJ noted that this report predated the bypass surgery on February 15, 2011, thus

19 indicating that there were options available to claimant despite Dr. Arik's claims to the contrary.  AR

20 44.  The ALJ also cited Dr. Arik's refusal on the April 26, 2012 questionnaire to state whether

21 claimant needs a job which permits shifting positions at will from sitting, standing or walking.  AR

22 44.  The ALJ also noted inconsistencies between Dr. Arik's two questionnaires such as whether the

23 claimant's legs should be elevated with prolonged sitting.  AR 44.

24         The ALJ also found inconsistencies in Dr. Lieber's February 2, 2011 checklist regarding

25 Plaintiff's physical limitations.  AR 45.  The ALJ criticized Dr. Lieber's and Dr. Arik's statements

26 that Plaintiff was unable to perform sedentary work because he has severe heart disease causing chest

27 pain at rest, and that may require emergency room visits.  The ALJ stated:  "Dr. Arik and Dr. Lieber

28 have improperly focused their attention on the least the claimant can do.  If the claimant's chest pains

are random, and require emergency room visits 'at times', this implies that the chest pain is not constant and may not interfere with his ability to perform sedentary work on an ongoing basis." AR 45. The ALJ again afforded greater weight to the opinions of Dr. Lagstein. AR 45-46.

The ALJ relied on the April 30, 2012 testimony of vocational expert Bernard Preston that Plaintiff would be able to perform the sedentary jobs of systems surveillance monitor, information clerk, tube operator and document preparer, although the number of jobs available in the last three categories would be eroded to a lesser or greater extent by Plaintiff's sensitivity and limitation with respect to odors such as perfumes. AR 48. The ALJ therefore again concluded that Plaintiff was not disabled. AR 49.

### 4. Appeals Council's Decision Denying Plaintiff's Request for Review of the ALJ's May 17, 2012 Decision.

In support of Mr. Avello's request for review of the ALJ's May 17, 2012 decision, his counsel submitted a letter brief dated August 17, 2012. AR 523-529. In the first numbered paragraph of the letter brief, Mr. Avello's counsel stated that "[t]he claimant's condition meets listing 4.04. See report of Dr. Freeman Exhibit A. Please have your medical staff review this." AR 523. The remainder of the letter brief dealt with Mr. Avello's challenge to the basis for the ALJ's decision that Mr. Avello had the residual functional capacity to perform sedentary work. In its January 25, 2013 Notice of Appeals Council Action, the Appeals Council stated only that "[i]n looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of the Appeals Council.   We found this information does not provide a basis for changing the Administrative Law Judge's decision." AR 11-12.

In its March 28, 2013 notice denying Plaintiff's request for review, the Appeals Council stated:

> We also looked at all the evidence that you and/or your attorney submitted in connection with the request for review. . . . The Administrative Law Judge evaluated your disability status only through May 17, 2012 but we admitted and considered records frm Centennial Hills Hospital (Exhibit 52F), Julia (sic) Freeman, M.D. (Exhibit 53F), and Nancy Donahoe, M.D. (Exhibit 54F) and we have concluded that the current record does not warrant or require a different assessment of your disability status through May 17, 2012, the date of the Administrative Law Judge's decision.

AR 2.

# DISCUSSION

To qualify for disability benefits under the Social Security Act, a claimant must show that he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in significant numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).[3]

Plaintiff argues that the Commissioner erroneously found that his impairments did not meet or equal a listed impairment as of June 22, 2009. Alternatively, Plaintiff argues that the ALJ improperly discredited his testimony regarding the severity of his symptoms and improperly rejected the opinions of his treating physicians which show that he was disabled. Plaintiff requests that the Court declare that he was disabled as of June 22, 2009 and remand with the direction that he be paid benefits from that date. In the alternative, Plaintiff argues that this case should be remanded to the Commissioner for consideration of new and material evidence pursuant to sentence six of 42 U.S.C.

---

[3]Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). At the first step, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). *Id.* § 404.1520(b). Second, if the claimant is not so engaged, then the Commissioner determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not disabled. *Id.* § 404.152(c). Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id.* § 416.920(e). If the claimant can engage in past relevant work, then no disability exists. *Id.* § 404.1520(e). If the claimant cannot perform past relevant work, the Secretary has the burden of proof at the fifth and final step to demonstrate that the claimant is able to perform other kinds of work. *Id.* § 404.1520(f). If the Secretary cannot meet his or her burden, the claimant is entitled to disability benefits. *Id.* § 404.1520(a).

1   § 405(g).

2         The Commissioner does not ask the Court to affirm the ALJ's May 17, 2012 decision.

3   Instead, the Commissioner states that this case should be remanded for further administrative

4   proceedings "because it is unclear whether the administrative law judge (ALJ) considered the effect

5   of obesity on Plaintiff's condition."  The Commissioner also states that "there is evidence in the

6   record showing that Plaintiff satisfied a listed impairment under 20 C.F.R. Part 404, Subpart P,

7   Appendix I (a listing) such as the findings of Julian Freeman, M.D.  The ALJ's decision does not

8   adequately explain why Plaintiff did not meet a listing."  *Defendant's Motion for Remand (#44)*, *pg.*

9   *1*.  The Commissioner requests that the Court remand this case with the instruction that:  "On

10  remand, the Appeals Counsel will direct the ALJ to consider the severity of Plaintiff's obesity.  The

11  ALJ will obtain medical expert evidence to evaluate whether Plaintiff met a listed impairment.   The

12  ALJ will also reweigh the medical opinions of record.  If warranted, the ALJ will reconsider the

13  credibility of Plaintiff's allegations."  *Defendant's Motion (#44), pg. 2.*

14        **I.  Standard of Review.**

15        A federal court's review of an ALJ's decision is limited to determining only (1) whether the

16  ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

17  legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924

18  F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

19  mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

20  accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000)

21  (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d

22  503 (9th Cir. 2001).  The court must look to the record as a whole and consider both adverse and

23  supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings

24  of the Commissioner of Social Security are supported by substantial evidence, the court must accept

25  them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one

26  rational interpretation, the court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864,

27  871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also*

28  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for

1   that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.

2   *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

3       In reviewing the administrative decision, the District Court has the power to enter "a

4   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

5   with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the

6   District Court "may at any time order additional evidence to be taken before the Commissioner of

7   Social Security, but only upon a showing that there is new evidence which is material and that there

8   is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

9
10   **II.   Whether This Case Should Be Remanded for and Award of Benefits or Further Hearing.**

11       Given the parties' positions, the Court must determine whether it is appropriate to make a

12   judicial finding of disability and remand this case to the Commissioner with the direction that

13   disability benefits be calculated and paid. If a judicial finding of disability is not appropriate, then

14   the Court must decide what issues should be remanded for further hearing or administrative

15   determination.

16       "Usually, [i]f additional proceedings can remedy defects in the original administrative

17   proceeding, a social security case should be remanded." *Garrison v. Colvin*, --- F.3d ---, 2014 WL

18   3397218. *19 (C.A.9 (Ariz.))(July 14, 2014), quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th

19   Cir. 1981) (internal quotation marks and citation omitted). *Garrison* notes, however, that "every

20   Court of Appeals has recognized that in appropriate circumstances courts are free to reverse and

21   remand a determination by the Commissioner with instructions to calculate and award benefits." *Id.*

22   (citations omitted). "Courts have generally exercised this power when it is clear from the record that

23   a claimant is entitled to benefits, observing on occasion that inequitable conduct on the part of the

24   Commissioner can strengthen, though not control, the case for such remand." *Id.* The court noted

25   that in *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988) ("*Varney II*"):

26       We held that "where there are no outstanding issues that must be resolved
         before a proper disability determination can be made, and where it is clear
27       from the administrative record that the ALJ would be required to award
         benefits if the claimant's excess pain testimony was credited, we will not
28       remand solely to allow the ALJ to make specific findings regarding that

27

1  testimony.  Rather, we will ... take that testimony to be established as
   true." *Id.* at 1401.  We explained that this credit-as-true rule is designed
2  to achieve fairness and efficiency.

3  *Garrison*, 2014 WL 3397218 at *19.

4  The Ninth Circuit has established a three-part credit-as-true standard which must be satisfied

5  in order to remand a case to an ALJ with instructions to calculate and award benefits: (1) the record

6  has been fully developed and further administrative proceedings would serve no useful purpose; (2)

7  the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant

8  testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true,

9  the ALJ would be required to find the claimant disabled on remand.  *Garrison*, at *20, citing *Ryan v.*

10 *Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d

11 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007); *Benecke v. Barnhart*,

12 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

13 *Garrison* states that it has been held to be an abuse of discretion not to remand with direction

14 to make payment when all three conditions are met.  *Id.* at *21.  The court noted, however, that in

15 *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003), it cautioned that the credit-as-true rule may not be

16 dispositive on remand in all cases and that the rule envisions some flexibility.  The court states:

17  *Connett*'s "flexibility" is properly understood as requiring courts to
    remand for further proceedings when, even though all conditions of the
18  credit-as-true rule are satisfied, an evaluation of the record as a whole
    creates serious doubt that the claimant is, in fact, disabled.  That
19  interpretation best aligns the credit-as-true rule, which preserves
    efficiency and fairness in a process that can sometimes take years before
20  benefits are awarded to needy claimants, with the basic requirement that
    a claimant be disabled in order to receive benefits.  Thus, when we
21  conclude that a claimant is otherwise entitled to an immediate award of
    benefits under the credit-as-true analysis, *Connett* allows flexibility to
22  remand for further proceedings when the record as a whole creates
    serious doubt as to whether the claimant is, in fact, disabled within the
23  meaning of the Social Security Act.

24 *Garrison*, 2014 WL 3397218 at *21.

25 There is no question in this case that Mr. Avello was disabled as of May 18, 2012, the date

26 that the Social Security Administration declared him to be disabled on his concurrent claim.  It is

27 also clear that there was no overnight change in Plaintiff's condition that suddenly rendered him

28 disabled on May 18th, but not disabled on May 17, 2012.  As Plaintiff's cardiologist, Dr. Arik, stated

28

in his November 1 and 29, 2011 reports, Plaintiff's coronary artery disease is a progressively worsening disease.  AR 869, 871.  The medical reports demonstrate that Mr. Avello's physical condition deteriorated from the time of his first  myocardial infarction (heart attack) in December 2008, to his second heart attack on June 22, 2009, and from that time forward.  The question is: At what point in this continuum did Plaintiff become disabled within the meaning of the Social Security Act?  If Plaintiff's impairments met or medically equaled a listing at step three of the sequential process prior to June 22, 2009 or at some time subsequent thereto, then he is entitled to benefits from that date.  Alternatively, if Plaintiff's impairments reached a level of severity by a certain point in time that rendered him incapable of performing even sedentary work, then he is entitled to disability benefits from that date.

In its January 4, 2012 remand order, the Appeals Council directed the ALJ to further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to the evaluation of symptoms.  The ALJ was also directed to "[g]ive full consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations."  AR 321.  In allegedly carrying out this assignment, ALJ Jenkins chose to discredit Plaintiff's testimony regarding the severity of his symptoms and the extent of his limitations for the entire period between June 22, 2009 and the date of his decision on May 17, 2012.  He likewise rejected the opinions of Plaintiff's physicians, Dr. Arik and Dr. Lieber that Plaintiff was or became disabled at any point during that time period.

In determining whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007), quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so.  *Id.* at 1036, citing *Smolen v. Chater*, 80 F.3d 1273, 1281

1  (9th Cir. 1996) and *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).  An ALJ may

2  not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully

3  corroborate the alleged severity of pain.  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005);

4  *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991).  "[T]o find the claimant not credible, the ALJ

5  must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on

6  conflicts between his testimony and his own conduct, or on internal contradictions in that

7  testimony."  *Robbins v. Social Sec. Admin.*, 466 F.3d at 884.

8         In his July 8, 2011 decision, the ALJ found that Plaintiff's "medically determinable

9  impairments could reasonably be expected to cause some of the alleged symptoms," AR 230, thereby

10 satisfying the first step of the credibility analysis in Plaintiff's favor.  The ALJ made no finding in

11 either of his decisions that Mr. Avello was a malingerer.  Nor is there indication of malingering in

12 the opinions of the treating or examining physicians.  The ALJ was therefore required to provide

13 specific, clear and convincing reasons for rejecting Plaintiff's testimony regarding the severity of his

14 symptoms.

15        In his May 17, 2012 decision, the ALJ stated that "[i]inconsistencies in the claimant's

16 testimony and statements render his allegations not credible."  AR 40.  The ALJ stated that Dr. Arik

17 indicated that the claimant's pain is random in frequency and intensity which contradicts claimant's

18 allegation that he suffers from "constant pain."  AR 40.  The ALJ's reference to Plaintiff's complaint

19 of "constant pain" was to a one sentence statement in his October 2009 disability report.  AR 439.

20 As stated in *Burch v. Barnhart, supra*, the ALJ's rejection of the credibility of Plaintiff's statements

21 of the severity of his symptoms based on his doctor's indication of arguably lesser severity was not a

22 valid reason for rejecting or discounting Plaintiff's credibility.  The ALJ's finding in this regard was

23 also based on an inaccurate and misleading characterization of Dr. Arik's statements regarding

24 Plaintiff's pain and other angina related symptoms.

25        Dr. Arik's April 26, 2012 questionnaire responses stated that Plaintiff's symptoms included

26 chest pain, shortness of breath, fatigue, weakness, palpitations, dizziness and sweatiness.  AR 911.

27 He further stated that Plaintiff's angina pain varied from several days in a row to Plaintiff going a

28 week or two without pain.  AR 912.  The medical records indicate that Mr. Avello's symptoms

1   worsened between his office visit with Dr. Resh on May 31, 2011, AR 805-807, and his office visit

2   with Dr. Arik on August 9, 2011.  Dr. Arik stated on August 9th that Plaintiff was "[p]ositive for

3   chest pain occurring every day at rest with no activity at all, and occurring with virtually all physical

4   activity."  AR 857.  In his November 29, 2011 letter report, Dr. Arik stated that Plaintiff had

5   "decompensated from a cardiac standpoint developing recurrent chest pain, having chest pain so

6   severe he considered going to the emergency room, and now having exertional wheezing with chest

7   tightness and pressure with above average levels of exertion[.]" AR 869.  Dr. Arik gave a similar

8   summary of Plaintiff's condition on November 1, 2011.  AR 870-871.  In his January 24, 2012

9   questionnaire responses, Dr. Arik gave substantially the same description of the nature and extent of

10  Plaintiff's angina symptoms as he did in his April 26, 2012 questionnaire responses.  AR 898-902.

11  On March 13, 2012, Dr. Arik stated that Plaintiff "has recurrent chest pains that occur randomly at

12  rest, at times necessitating emergency transport to an Emergency Room."  AR 909.  The medical

13  records therefore do not support a finding that Plaintiff's description of the severity of his angina

14  symptoms was disproportionate to the doctor's descriptions of his symptoms.

15      The ALJ also stated that Plaintiff provided inconsistent information about how much weight

16  he was able lift or carry, stating on one occasion that he could lift only 5 pounds, but later stating that

17  he was limited to lifting 10 pounds.  AR 42.  The variance in these statements does not amount to a

18  significant inconsistency that diminishes Plaintiff's credibility.  In either case, Mr. Avello was

19  representing that he was unable to lift or carry relatively light-weight objects.   The ALJ also noted

20  that Plaintiff's testimony that he had an inoperable hernia lacked credibility because the record

21  reflected no actual treatment for this condition.  AR 43.  While the ALJ could properly disregard the

22  hernia as an impairment or limitations because it was not documented in the medical records, the

23  lack of such reference does not significantly diminish Mr. Avello's credibility.  Stated conversely,

24  the medical evidence does not disprove Mr. Avello's testimony that he has a hernia which cannot be

25  treated operatively due to his heart condition.

26      The ALJ stated that Plaintiff's daily activities were not limited to the extent one would expect

27  given his complaints of disabling symptoms and limitations.  The ALJ also stated that Plaintiff's

28  daily activities were sedentary in nature, which was consistent with his residual functional capacity.

AR 43.  Mr. Avello described his daily life as essentially being housebound, except for driving his children to and from school and occasionally going to the salon where his wife was employed.  There was no testimony indicating that Plaintiff performed any household activities such as cooking, cleaning or laundry.  Rather, Mr. Avello testified that he spent most of the day watching television and taking naps.  He also testified that he does not go upstairs during the day because of difficulty climbing stairs.

The court in *Garrison* states:

> We have repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more that merely resting in bed all day.  *See Smolen*, 80 F.3d at 1287 n. 7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferrable to a work environment where it might be impossible to rest periodically or take medication.") . . .

2014 WL 3397218, at *17.

Plaintiff's description of his daily activities during the June 13, 2011 hearing was clearly not inconsistent with his complaints of disabling symptoms and limitations.  Neither the ALJ or Plaintiff's counsel further developed the record regarding Plaintiff's daily activities during the March 5 and April 30, 2012 hearings, notwithstanding the medical records that indicated a worsening of Plaintiff's angina symptoms in the latter part of 2011.

In his July 8, 2011 decision, the ALJ noted that Plaintiff's testimony that he suffered from the side effects of medication, including sleeplessness, dry mouth, gagging, occasional vomiting and diarrhea, was not corroborated by the medical records.  AR 231.  In fact, the records show that in May 2009, Plaintiff complained about a cough that started after he began taking medication following his 2008 heart attack.  AR 704-705.  During the March 5, 2012 hearing, the ALJ commented that Plaintiff was coughing a lot.  Plaintiff explained that it was a side effect of his blood pressure medication, as he had also reported in his previous hearing testimony.  AR 152-153, 172-173.  This observation would also appear to lend credibility to Plaintiff's earlier testimony regarding . . .

. . .

32

1   this condition.[4]  The ALJ was on firmer ground in questioning Plaintiff's June 13, 2011 testimony

2   regarding problems with diarrhea and vomiting.  The medical records contain only one reference to

3   an episode of vomiting on September 8, 2010.  AR 696.  The Court has found no references in the

4   medical records to complaints of diarrhea.[5]  The ALJ could therefore legitimately discount the

5   credibility of Plaintiff's testimony that he suffered frequent bouts of diarrhea and vomiting.

6        In his July 8, 2011 decision, the ALJ also discounted Plaintiff's credibility on the grounds

7   that he had not generally received the type of medical treatment one would expect for a totally

8   disabled person.  AR 231.  The ALJ never explained, however, what treatment he would have

9   expected to see if Plaintiff was disabled.  This bare statement was not a valid reason to discount

10   Plaintiff's credibility.

11        The ALJ failed to provide specific, clear and convincing reasons for rejecting the credibility

12   of the Plaintiff's testimony regarding the severity of his chest pain and other angina related

13   symptoms--shortness of breath, fatigue and dizziness.  Moreover, the ALJ failed to consider the

14   worsening of Plaintiff's coronary artery disease and symptoms, particularly beginning in the latter

15   part of 2011, which would have adversely effect his ability to perform sedentary work, even

16   assuming that he could have performed such work prior to that time.

17        The ALJ afforded little weight to the opinions of Plaintiff's physicians Dr. Arik and Dr.

18   Lieber regarding Plaintiff's symptoms and limitations, or their opinions that he is disabled from

19   performing any work.  AR 43, 45.  The ALJ, however, "afford[ed] Dr. Lagstein's opinion that

20   Plaintiff can perform light to sedentary work significant weight in light of his examination of the

21   claimant, his specialty in cardiology, and his diagnostic testing of the claimant."  AR 46.

22        The standards governing the weight to be given to the opinions of treating, examining and

23   reviewing physicians was recently summarized in *Ghanim v. Colvin*, --- F.3d ---, 2014 WL 4056530,

24   *5 (C.A.9 (Wash.)) (August 18, 2014) as follows:

25

26        [4]The ALJ did not reference this as an adverse credibility finding in his May 17, 2012 decision.

27        [5]On May 31, 2011, Dr. Resh noted that Mr. Avello was allergic to Niaspan and Lisnoporil, but no
28   symptoms related to that allergy were described.  AR 806.

Generally, the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician. *Holohan v. Massanari,* 246 F. 3d 1195, 1202 ( 9th Cir. 2001); 20 C.F.C. § 404.1527(c). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir.2007) (internal quotations omitted) (alterations in original); *see also* 20 C.F.R. § 404.1527(c)(2)). To reject an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir.2005).

Even if a treating physician's opinion is contradicted, the ALJ may not simply disregard it. The ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion. *Orn,* 495 F.3d at 631; 20 C.F.R. § 404.1527(c)(2). These factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, the "[n]ature and extent of the treatment relationship" between the patient and the treating physician, the "[s]upportability" of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole. 20 C.F.R. § 404.1527(c)(2)-(6). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Orn,* 495 F.3d at 631. Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability. *Holohan,* 246 F. 3d at 1202– 03. An ALJ may only reject a treating physician's contradicted opinions by providing "specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec. Admin.,* 528 F.3d 1194, 1198 (9th Cir.2008); *accord Holohan,* 246 F. 3d at 1202– 03.

In rejecting Dr. Arik's opinions that Plaintiff is disabled, the ALJ relied in part on his purported testimony that nitroglycerin "is a valuable and quite effective way of immediately aborting or alleviating an angina episode." AR 43. Later in the same paragraph, the ALJ states: "Inasmuch as the claimant's angina can be treated with nitroglycerin, I find that the claimant has the functional capacity to work, notwithstanding the possibility that the employers might conceivably be concerned regarding his condition or treatment." AR 43. In the next paragraph, the ALJ stated that Dr. Arik's opinion that the claimant is totally and permanently disabled "is an unduly extreme statement, particularly in light of his testimony regarding the effectiveness of nitroglycerin in the treatment of angina." *Id.* Still later in the decision, the ALJ stated: "[I]n addition, Dr. Arik testified that nitroglycerin is remarkably effective in alleviating pain and symptoms and aborting episodes." AR 45. In rejecting Dr. Arik's statements that Plaintiff was likely be absent from work four or more

34

days per month, the ALJ also cited his alleged testimony that "nitroglycerine is very effective in treating the claimant's angina virtually instantly, hence those episodes should not prevent the claimant from going to or staying at work, particularly at a sedentary level." AR 42.

The ALJ mischaracterized Dr. Arik's testimony and drew inferences that are not supported by the doctor's testimony or other medical evidence in the record.  Dr. Arik generally testified that nitroglycerin has "been around a long time to treat angina.  It does provide symptom relief by relaxing and dilating arteries, improving flow temporarily, and yes, it's a valuable way of aborting an episode." AR 111.  He was not asked and did not state that nitroglycerin instantly or promptly relieved Mr. Avello's chest pain symptoms such that he was capable of working an eight hour day. Although the ALJ is entitled to make reasonable inferences from the record, *Ghanim*, 2014 WL 4056530, at *4, his interpretation of Dr. Ariz's testimony regarding the effect of nitroglycerin on Plaintiff was not reasonable.[6]  With the exception one incident in which Plaintiff's chest pain was relieved by nitroglycerin, the medical records also do not indicate that Plaintiff's chest pains, particularly after mid 2011 were reasonably controlled by nitroglycerin.

The ALJ's rejection of Dr. Arik's opinion that Plaintiff would likely be absent from work four or more days per month was based on a chart of Plaintiff's medical treatment dates which showed that in most months he either had no medical treatment or less than four treatment dates.  In some months, however, Plaintiff  had medical treatment dates significantly in excess of four days in a month.  AR 40-42.  Plaintiff points out that the chart did not include the dates for EECP therapy that he received in the latter part of 2011.  In any event, Dr. Arik's opinion was that Plaintiff would miss more than four days from work per month because of his *impairments or treatment*.

In giving greater weight to the opinions of Dr. Lagstein, the ALJ failed to consider the worsening of Plaintiff's coronary artery disease after Dr. Lagstein's second examination of the Plaintiff on April 25, 2011.  Dr. Lagstein's assessment was also predicated in part on the expectation

---

[6]Plaintiff has attached to his Motion to Remand (#35), a March 20, 2012 office visit note by Dr. Arik in which he stated: "Nothing has changed in Mr. Avello's life.  He continues to have severe angina, very unpredictably in onset, occurring at rest, occurring with minimal activity, sometimes responding to nitroglycerin, sometimes not."  This office visit note was not in the record before the ALJ or the Appeals Council.

that Plaintiff's functional capacity would improve as he further recovered from the February 2011 bypass surgery.  On August 9, 2011, however, Dr. Arik noted that Plaintiff was now having chest pains every day at rest with no activity at all and with virtually all physical activity.  AR 857.  This indicated a significant increase in the level of Plaintiff's chest pain from what was previously reported.  Dr. Arik's subsequent records continued to document this increase level of symptoms. Thus, even if the ALJ had reasonable grounds for giving greater weight to Dr. Lagstein's opinion regarding Plaintiff's residual functional capacity as of January 19, 2010 or April 25, 2011, those opinions were not relevant to Plaintiff's residual functional capacity by the latter part of 2011 when the evidence indicates his physical condition had significantly worsened.

The medical records and opinions, however, do not necessarily support a finding that Plaintiff was disabled following his release from the hospital in June 2009 or for a significant period of time thereafter.  Dr. Arik's January 6, 2010 opinion that Plaintiff was totally and permanently disabled was not supported by any specific reports of symptoms, examination findings or an evaluation of specific physical capabilities.  There is also no indication that Dr. Arik saw Plaintiff between his June 2009 hospitalization and the January 6, 2010 consultation.  During 2010, Plaintiff was periodically examined by Dr. Wesley who commented that Plaintiff's symptoms of chest pain appeared disproportionate to the testing parameters.  AR 782.  Dr. Wesley's office visit notes did not indicate that Plaintiff was experiencing significant chest pain or shortness of breath.

Plaintiff had an episode of increased chest pain for which he was hospitalized in September 2010.  Dr. Arik subsequently issued a brief letter on January 25, 2011, stating that Plaintiff was totally disabled due to coronary artery disease, that his condition would never improve and that it would only get worse.  Once again, however, Dr. Arik did not explain the clinical basis of his disability opinion; nor is there any indication that he examined Plaintiff during the year since his previous evaluation on January 6, 2010.  Plaintiff thereafter experienced an increase in chest pain symptoms in early February 2011 which led to cardiac catherization and triple basis grafting of the left arteries by Dr. Donahoe on February 15, 2011.

The medical records, combined with Plaintiff's testimony, reasonably demonstrate that his angina reached a disabling level after his bypass in February 2011, and clearly by the latter part of

36

that year.  Although the record could support a finding that Plaintiff was disabled as early as June 22, 2009 or during 2010, it does not require such a finding.  The record as a whole, therefore, creates serious doubt as to *when* Mr. Avello became disabled.  Under these circumstances, it is not proper to apply the credit-as-true rule to direct a finding that Plaintiff was disabled as of June 22, 2009.  The Court reiterates, however, that the record strongly supports a finding that Plaintiff's angina symptoms reached a level of severity at some point between February and August 2011 that rendered him disabled from performing even sedentary work.  Any contrary determination on remand should be viewed with suspicion.

Following the ALJ's May 17, 2012 decision, the Plaintiff submitted a June 22, 2012 letter from Dr. Julian Freeman stating that Plaintiff met or equaled a listing under 20 C.F.R. Part 404, Subpart P, Appendix I, Sections 404.A.1 and 404.B even before the alleged onset date, June 22, 2009.  Dr. Freeman stated that Plaintiff's treadmill tests were misread, and if read properly would meet listing 404.A.1.  He stated, however, that even without the treadmill test results, as properly re-read or re-interpreted, Plaintiff's condition met the listing criteria under section 404.B.  AR 531-533.  Taking Dr. Freeman's letter at face value would entitle Plaintiff to an award of disability benefits as early as June 22, 2009.  The ALJ, however, did not have an opportunity to consider this opinion evidence.  Although the ALJ had access to medical records on which Dr. Freeman's opinion is based, the issue of whether Plaintiff met or equaled a listing does not appear to have been raised until Plaintiff's June 2012 request for review by the Appeals Council.  The Appeals Council should have again remanded Plaintiff's claim to the ALJ for a determination as to whether and when he met or equaled a listing.  The Court agrees with the Commissioner that it is proper to remand this case to the Social Security Administration for such a determination, rather than for the Court to make such a determination.

## CONCLUSION

Based on the foregoing, the Court concludes that Plaintiff's claim for disability benefits should be remanded to the Social Security Administration for further administrative proceedings, including making a determination as whether and when Plaintiff's medically determinable impairments met or equaled a listing at step three of the sequential evaluation process, or,

1    alternatively, when Plaintiff's impairments reached a level of severity such that he no longer had the

2    residual functional capacity to perform even sedentary work.   In reconsidering the latter issue, the

3    agency should take note of the strong evidence indicating that Plaintiff's symptoms reached a level

4    of such severity between February and August 2011, although an earlier finding of disability is not

5    ruled out by this recommendation.  The Court also recommends that this matter be assigned to

6    another administrative law judge in order to insure an independent, fair and objective evaluation of

7    Plaintiff's claim for disability benefits.

8                                              **RECOMMENDATION**

9            **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion to Reverse or Remand the

10   Commissioner's Decision Pursuant to Sentence Four (#32); Plaintiff's Motion to Reverse or Remand

11   the Commissioner's Decision Pursuant to Sentence Six (#34); and the Commissioner's Motion for

12   Remand Pursuant to Sentence Four of 42 U.S.C. Section 405(g) (#44) (#) be **granted**, in part, and

13   **denied**, in part, and that this case be remanded to the Social Security Administration for further

14   determination of when Plaintiff became disabled within the meaning of the Social Security Act.

15                                                   **NOTICE**

16           Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

17   writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held

18   that the courts of appeal may determine that an appeal has been waived due to the failure to file

19   objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also

20   held that (1) failure to file objections within the specified time and (2) failure to properly address and

21   brief the objectionable issues waives the right to appeal the District Court's order and/or appeal

22   factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir.

23   1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

24           DATED this 16th day of September, 2014.

25

26                                                    _George Foley Jr._
                                                     _____
27                                                    GEORGE FOLEY, JR.
                                                     United States Magistrate Judge

28

                                                       38